266 So.2d 155

**Paul Warren BATES**

v.

**STATE.**

8 Div. 27.

Court of Criminal Appeals of Alabama.

June 30, 1972.

Rehearing Denied Aug. 1, 1972.

Sullins & King, Huntsville, for appellant.

MacDonald Gallion, Atty. Gen., and Walter S. Turner, Asst. Atty. Gen., for the State.

ALMON, Judge.

Paul Warren Bates was convicted of possessing a pistol after having been con-

victed of a crime of violence. Tit. 14, § 174, Code of Alabama, 1940, recompiled 1958. His punishment was fixed at three years in the penitentiary.

It was stipulated that Bates had been convicted of second degree burglary and grand larceny on May 2, 1960. These are crimes of violence within the meaning of Tit. 14, § 174, Code, supra. See Tit. 14, § 172, Code, supra.

I.

Randall Tishner, the arresting officer, testified that on the night of December 5, 1968, while patrolling in a police car he was dispatched to the Bella Vista Club in Huntsville. When he arrived a man was standing in the parking lot. Officer Tishner asked the man if he was Paul Warren Bates and when the man replied in the affirmative the officer conducted a search by patting down the outside of Bates' clothing. Defense counsel objected to any testimony concerning the fruits of the search. Out of the presence of the jury the State made a showing by Officer Tishner that he received a call that Bates had a pistol and was at the Bella Vista Club. He further testified that he did not know Bates personally but did have knowledge that he had been involved in a burglary during which a police officer was shot at. Regarding the manner in which the search was made Officer Tishner further testified that after Bates identified himself he had him put his hands against the outside wall of the club, patted the outside of his clothing and found a pistol in his right front pant's pocket. Officer Tishner took the pistol from him and placed him under arrest.

This testimony was repeated in the presence of the jury and the pistol was introduced in evidence over the defendant's objection.

We are called upon to decide whether the seizure of the pistol from the defendant's person and its subsequent introduc-

tion into evidence was contrary to the proscriptions of the Fourth Amendment to the United States Constitution made applicable to the States through the due process clause of the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

The police conduct here in question has the sanction of state law by virtue of Act No. 157, Acts of Alabama, Special Session, 1966; Tit. 15, § 118(1) and 118(2), Code, supra. This Act, sometimes referred to as the "stop and frisk" law, is as follows:

"Section 1. A sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed, or is about to commit a felony or other public offense, and may demand of him his name, address and an explanation of his actions.

"Section 2. When a sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county, or any highway patrolman or state trooper has stopped a person for questioning pursuant to this chapter and reasonably suspects that he is in danger of life or limbs, he may search such person for a dangerous weapon. If such officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."

The pertinent provisions of § 118 are identical to those in New York's "stop and frisk" law. N.Y.Code, Criminal Proce-

dure, § 180–a. In Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, the United States Supreme Court made the following observation concerning § 180–a of the New York Code:

"The parties on both sides of these two cases have urged that the principal issue before us is the constitutionality of § 180–a 'on its face.' We decline, however, to be drawn into what we view as the abstract and unproductive exercise of laying the extraordinarily elastic categories of § 180–a next to the categories of the Fourth Amendment in an effort to determine whether the two are in some sense compatible. The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case. . . .

"Section 180–a, unlike § 813–a, deals with the substantive validity of certain types of seizures and searches without warrants. It purports to authorize police officers to 'stop' people, 'demand' explanations of them and 'search [them]' for dangerous weapon[s]' in certain circumstances upon 'reasonable suspicion' that they are engaged in criminal activity and that they represent a danger to the policeman. The operative categories of § 180–a are not the categories of the Fourth Amendment, and they are susceptible of a wide variety of interpretations. New York is, of course, free to develop its own law of search and seizure to meet the needs of local law enforcement, see Ker v. State of California, 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963), and in the process it may call the standards it employs by any names it may choose. It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct. The question in this Court upon review of a state-approved search and seizure 'is not whether the search [or seizure] was authorized by state law. The question is rather wheth-

er the search was reasonable under the Fourth Amendment. Just as a search authorized by state law may be an unreasonable one under that amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.' Cooper v. State of California, 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967).

"Accordingly, we make no pronouncement on the facial constitutionality of § 180-a. . . ."

The United States Supreme Court for the first time in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and its companion cases, Sibron v. New York and Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, recognized the concept of "stop and frisk" and held that police officers may, under appropriate circumstances, detain and search a person suspected of criminal activity even though there is less than probable cause for arrest.

Recently in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, June 12, 1972, the Court held a policeman in making an investigatory stop based on an informer's tip, may conduct a limited protective search for concealed weapons when he has reason to believe that the suspect is armed and dangerous. The evidence in that case showed that a police sergeant was alone early in the morning on patrol duty in a high crime area of Bridgeport, Connecticut at approximately 2:15 A.M. when a person known to him approached his cruiser and informed him that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist. The policeman approached the vehicle to investigate the informant's report, tapped on the car window and asked the occupant to open the door. When the occupant rolled down the window instead of opening the door the policeman reached into the car and removed a fully loaded revolver from the occupant's waistband. The gun had not been visible to the policeman from outside the car but was precisely in the place indicated by the informant. The occupant of the car was then arrested by the policeman for unlawful possession of the pistol. A search incident to the arrest was conducted following the arrival of other officers and disclosed substantial quantities of heroin on the occupant's person and in the car as well as a machete and a second revolver hidden in the automobile.

In rejecting the respondent's contention that the rationale of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, was applicable to the informant's tip, the Court stated:

"In reaching this conclusion, we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response."

The Court further stated that "the informant was known to him personally and had provided him with information in the past."

It is noteworthy that the Court did not use the word, "reliable," in characterizing the information that the informant had previously supplied this police officer. For a better understanding of the reliability of the informant we quote from the dissenting opinion of Mr. Justice Marshall:

"The only information that the informant had previously given the officer in-

**493**

volved homosexual conduct in the local railroad station. The following colloquy took place between respondent's counsel and the officer at the hearing on respondent's motion to suppress the evidence that had been seized from him.

"'Q. Now, with respect to the information that was given you about homosexuals in the Bridgeport Police Station [sic], did that lead to an arrest? A. No.

"'Q. An arrest was not made. A. No. There was no substantiating evidence.

"'Q. There was no substantiating evidence? A. No.

"'Q. And what do you mean by that? A. I didn't have occasion to witness these individuals committing any crime of any nature.

"'Q. In other words, after this person gave you the information, you checked for corroboration before you made an arrest. Is that right? A. Well, I checked to determine the possibility of homosexual activity.

"'Q. And since an arrest was made, I take it you didn't find any substantiating information. A. I'm sorry counselor, you say since an arrest was made.

"'Q. Was not made. Since an arrest was not made, I presume you didn't find any substantiating information. A. No.

"'Q. So that, you don't recall any other specific information given you about the commission of crimes by this informant? A. No.

"'Q. And you still thought this person was reliable. A. Yes.'"

■ Thus, we perceive no substantial difference between the facts in *Adams,* supra, and those in the present case. In this case Officer Tishner received a radio dis-

patch that the defendant was at a certain place armed with a pistol. Police officers had been shot at during the commission of a burglary in which the defendant was involved. With this knowledge it would certainly have been poor police work for Officer Tishner to have ignored this dispatch. When he arrived at the Bella Vista Club he found the defendant present which tended to corroborate the information he had received. Considering what Officer Tishner knew, he had reason to believe that the defendant was armed and very possibly dangerous. We conclude that his patting down the defendant and removing from him the pistol in question was reasonable police conduct within the meaning of the Fourth Amendment.

This case seems to us part of that "protean variety of the street encounter," for which a "narrowly drawn authority" to engage in a limited search for weapons exists when a police officer, on the basis of "specific reasonable inferences which he is entitled to draw from the facts in light of his experience" has "reason to believe that he is dealing with an armed and dangerous individual." Terry v. Ohio, supra.

This case, unlike *Terry,* did not involve "unusual conduct" observed on the street by an officer. But we are of the opinion that this radio dispatch, even conceding that it was predicated upon an unidentified informant, in light of the visual corroboration and the knowledge Officer Tishner possessed, justified the patting down of the defendant. For cases upholding searches similar to this based upon anonymous tips coupled with visual corroboration see People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S. 2d 1, 229 N.E.2d 581; and Ballou v. Massachusetts, 1 Cir., 403 F.2d 982.

II.

■ It is further argued in brief that if a defendant, at the time of possessing a

concealed weapon had good reason to apprehend an attack on his person, then the jury may consider such fact, if shown by the evidence, either in justification of the offense or in mitigation of the punishment, as the jury may determine. This argument is untenable for two reasons. First, the court fixes the punishment when a conviction like the one in the present case is under Tit. 14, § 174, Code, supra; and, secondly, the provisions of Tit. 14, § 162 apply solely to a charge for carrying a concealed weapon under Tit. 14, § 161. Hodges v. State, 45 Ala.App. 29, 221 So.2d 922, cert. denied 284 Ala. 731, 221 So.2d 923.

Finding no reversible error, the judgment appealed from is due to be affirmed.

Affirmed.

CATES, P. J., TYSON and HARRIS, JJ., concur.

CATES, Presiding Judge (concurring):

*Terry, Sibron* and *Peters,* (op. cit. in Judge Almon's opinion) lay down the Federal Fourteenth Amendment Standards for state adjudication.

As to Alabama's standards I would ignore Michie's 1958 unofficial code and instead go to the original source Act No. 157, approved August 19, 1966 (Acts 1966 Special Session, p. 183).

There we find that the title of the Act limits the substance to a peace officer's (1) temporary questioning of persons in public places and (2) a search for weapons. This limitation narrows the breadth of the wording of the Act to what is reasonably germane to these two acts, i. e., questioning and searching for weapons, § 45 Cons., 1901. Kendrick v. Boyd, 255 Ala. 53, 51 So.2d 694.

Thus when we collate the Federal limitations with the Alabama Act as controlled by its title I consider that we have a procedure with the following combined:

1. Reasonable suspicion regarding a *felony* or other public offense as more fully set out;

2. A palpation of the contours of the outer clothing[1] of the body held tightly against the body itself so as to reveal to the sense of touch any bulges which might signify the presence of hidden weapons;

3. And if the frisk gives such a clue an ordinary search within pockets or other parts of the clothing to seize the suspected object; and

4. Arrest if the friskee has a weapon contrary to law, e. g., a pistol concealed or without benefit of a permit.

5. If no weapon is found the detainee is due to be released and contraband found, if any, must be kept only for forfeiture and cannot be used in evidence.

---

1. In this case it is not necessary for us to decide whether a detainee can be asked to unfasten an overgarment such as a raincoat or overcoat.