267 So.2d 802

**Jeffery L. WHITE, alias**

v.

**STATE.**

**3 Div. 139.**

Court of Criminal Appeals of Alabama.

Oct. 10, 1972.

**6**

Warren S. Reese, Jr., Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Don C. Dickert, Asst. Atty. Gen., for the State.

CATES, Presiding Judge.

Possession of marijuana (one cigarette): sentence, four years imprisonment. Code 1940, T. 22, §§ 256–258.

**I**

On or about February 7, 1971 at about one o'clock in the morning Officers Allyson and Butler of the Montgomery Police Department saw White "coming out of the shadows and get on a walkway" at or near a "Pak-A-Sak" store near the corner of Vaughn and Carter Hill Roads. White "went to the end of the walkway and turned around and went back to the corner and at this point is when we approached him." White was wearing a fairly heavy coat.

Allyson asked White for some identification and the latter gave him an "Auburn Student's Card." Allyson asked White "What he was doing out at this time of night and his explanation was not satisfactory."

Then "for self-protection" Allyson searched White, "with the right leg working up, emptying all the pockets and then switching to the left side and working up from the left up to the left shoulder." Over objection Allyson testified that in White's left front shirt pocket he found a cigarette which upon analysis was found to contain marijuana. He arrested White.

**II**

It is clear that before the search White had committed—under the evidence—no offense to Allyson's knowledge. Hence, the arrest and seizure of the evidence cannot flow from Code 1940, T. 15, § 154, which reads as follows:

"An officer may also arrest any person, without warrant, on any day and at any time, for any public offense commit-

ted, or a breach of the peace threatened in his presence; or when a felony· has been committed, though not in his presence, by the person arrested, or when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it; or when he has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed; or on a charge made, upon reasonable cause, that the person arrested has committed a felony."

However, we also have a Stop and Frisk Act, No. 157, August 19, 1966 .(1966 Acts Sp.Sess. p. 183) see Michie's 1958 unofficial Code, T. 15, §§ 118(1) and 118(2). See Bates v. State, 1972, 48 Ala.App. 489, .266 So.2d 155. This statute reads as follows:

"AN ACT

Relating to the temporary questioning of persons in public places and search for weapons, by any lawful officer.

Be It Enacted by the Legislature of Alabama:

"Section 1. A sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their respective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense, and may demand of him his name, address and an explanation of his actions.

"Section 2. When a sheriff, or other officer acting as sheriff, or his deputy, or any constable, acting within their re-

spective counties, or any marshal, deputy marshal, or policeman of any incorporated city or town, within the limits of the county, or any highway patrolman or state trooper has stopped a person for questioning pursuant to this Act and reasonably suspects that he is in danger of life or limbs, he may search such person for a dangerous weapon. If such officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.

"Section 3. All laws or parts of laws which conflict with this Act are repealed.

"Section 4. This Act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law."

First, it is to be noted that the title of this statute apprises the Legislature (and the public) that a lawful officer may temporarily question persons in public places. Second, that such an officer may search a person so questioned for weapons.

It is obvious that the title of Act No. 157 does not reveal or hint that the second sentence of § 2 thereof authorizes a general exploratory search without a warrant; other than the frisk for weapons. That sentence reads in pertinent part:

"If such officer finds * * * any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."

Since 1865 the successive constitutions of Alabama have provided as does our current § 45 that each law shall contain but one subject.[1]

---

[1]. In Blakeney v. Blakeney (1837) 6 Port. 109 we find:
"The intention of the act being so clearly manifested in its body, we

scarcely deem it necessary to call in aid its title, which speaks with clearness its end. The title of a statute, we are aware, is an unsafe criterion,

In Jones v. Stokes, 179 Ala. 579, 60 So. 280 of § 45 of the 1901 Constitution, Sayre, J., wrote:

> "* * * By this provision of the Constitution the title of every act must be made the subject of special consideration by the Legislature. The body of the act under review carries into effect the purpose declared in the title, and limits the cases in which it shall operate. * * *"

More recently our Supreme Court in Brown v. National Motor Fleets, Inc., 276 Ala. 493, 164 So.2d 489 opined in pertinent part as follows:

> "* * * The Court thinks that the learned Chief Justice in his dissenting opinion has failed to take due account of the Title of said Act No. 672, which gives notice that the Act shall apply only to 'trucks, truck-tractors, trailers, and semi-trailers *operated for hire.*'

> "The term 'operate for hire' has a well-known and definite meaning in the jurisprudence of this country.

> *     *     *     *     *     *

> "The fact that Section (b) in the body of the Act purports to enlarge the definition of 'for hire' is inefficacious to render the appellee liable for the license since the enlarged definition is directly conflictory with the Title of the Act which gives no notice of this broad definition and, as to this appellee, the enlargement of the definition contains more than one subject and would be unconstitutional under Section 45.

> "It is unnecessary to engage in a lengthy discourse on the purposes of Section 45 of the Constitution. Suffice it to say that the Title alone should be considered and a determination made of the object, or objects, it expresses; and

by which to determine its meaning; yet, in cases where the intent is not plain, it may slightly assist in removing ambiguities."

the body of the Act, regardless of definition, cannot enlarge the meaning.

> *     *     *     *     *     *

> "We are at the conclusion that the Act is broader than the Title and, therefore, that part which is within both the Title and the body of the Act will stand, while that part not indicated by the Title will fall.—Opinion of the Justices, 247 Ala. 195, 23 So.2d 505; and cases cited at 247 Ala., p. 199, 23 So.2d, p. 508."

█ Thus, we may subsume: (1) an overbroad title can be surplusage as to the enacting clause; (2) overbroad enactment cannot enlarge a narrower title; and (3) in the latter instance, if severability is feasible, the surplusage in the enacting clauses will be invalid, but the remainder—if fairly embraced in the title—will be upheld as constitutionally passed.

█ This results in our concluding that so much of § 2, second sentence, supra, as would authorize a search where no cause for arrest exists, e. g., in the absence of the possession of a dangerous weapon disclosed by patting or frisking, is necessarily beyond the title of said Act No. 157 and to that extent invalid under § 45 of the Constitution.

### III

Additionally, we find pertinent in the instant case the three cases of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 and Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed. 2d 917. This trilogy constitutes the stop-and-pat triplets.

In *Terry,* supra, the State of Ohio had no statute; in *Sibron* and *Peters,* supra, New York, had an enactment in ipsissimis verbis as Alabama's Act No. 157, *supra.*

This was before adoption of the antecedent of § 45, Const. 1901 as it now reads.

In *Sibron,* the Supreme Court said, among other things:

"* * *, we make no pronouncement on the facial constitutionality of § 180–a."

—392 U.S. at 61, 88 S.Ct. at 1902.

The opinion then veered into a discussion of the Reasonable Search and Seizure Clause of the Fourth Amendment of the United States Constitution. That clause reads:

"The right of the people to be secure in their *persons,* houses, papers and effects, against unreasonable searches and seizures, shall not be violated, * * *." (Italics added).

In *Sibron,* the physical seizure and search of the appellant's person was held to be unreasonable because the proof showed that the officer came upon nothing giving reasonable grounds to believe that Sibron was armed and dangerous.

The opinion continues:

"* * * The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. * * *"

*       *       *       *       *       *

"* * * The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in *Terry* place his hands in the pockets of the men he searched.

In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrusts his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man. * * *"

—392 U.S. at 64 & 65, 88 S.Ct. at 1904

*Terry,* supra, involved reconnoitering which led the officer to suspect that Terry and another were "casing a job." On these two joining a third in front of Zucker's store the officer questioned them.

"* * * He was not acquainted with any of the three men by name or by sight, and he had received no information concerning them from any other source. When the men 'mumbled something' in response to his inquiries, Officer McFadden grabbed petitioner Terry, spun him around so that they were facing the other two, with Terry between McFadden and the others, and patted down the outside of his clothing. In the left breast pocket of Terry's overcoat Officer McFadden felt a pistol. He reached inside the overcoat pocket, but was unable to remove the gun. At this point, keeping Terry between himself and the others, the officer ordered all three men to enter Zucker's store. As they went in, he removed Terry's overcoat completely, removed a .38-caliber revolver from the pocket and ordered all three men to face the wall with their hands raised. Officer McFadden proceeded to pat down the outer clothing of Chilton and the third man, Katz. He discovered another revolver in the outer pocket of Chilton's overcoat, but no weapons were found on Katz. The officer testified that he only patted the men down to see whether they had weapons, and that he did not put his hands beneath the outer garments of either Terry or Chilton until he felt their guns. So far as appears

.from the record, he never placed his hands beneath Katz' outer garments. Officer McFadden seized Chilton's gun, asked the proprietor of the store to call a police wagon, and took all three men to the station, where Chilton and Terry were formally charged with carrying concealed weapons."

—392 U.S. at 7, 88 S.Ct. at 1872

After distinguishing between a search incident to an arrest (i. e., for weapons and evidence as later delimited in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685) and "a limited search for weapons" by pointing out (392 U.S. at 26, 88 S.Ct. 1868) that each procedure is designed to serve quite different interests, the opinion then defines the referential framework for analyzing such cases.

"Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. * * * And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. * * *"

After an examination of McFadden's conduct, the court points out that

"[h]e did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons,

and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his pat down which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find."

—392 U.S. at 29 and 30, 88 S.Ct. at 1884

The conclusion reads:

" * * * We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.

"Affirmed."

In People v. Bueno, Colo., 475 P.2d 702, we find:

"During the frisk the police officer felt a bulge in the righthand pocket of the defendant's jacket. The officer reached into the pocket and pulled out some keys and the gold ring which the appellant seeks to suppress as evidence. At this point the appellant was told that

he was under arrest and he was taken into custody.

"Appellant contends that the taking of the gold ring from his personal possession under these circumstances was a violation of the Fourth and Fourteenth Amendments to the United States Constitution and therefore the trial court's order denying the suppression of this evidence should be reversed. We agree.

"The crux of this case is not the propriety of the officer's steps to investigate the appellant's so-called suspicious behavior, but rather whether there was justification for the invasion of the appellant's personal security by searching him and recovering the ring that the People now seek to introduce as evidence."

\*   \*   \*   \*   \*   \*

"In this case, however, we need not determine whether the officer's belief that the appellant was armed and dangerous was reasonable. The search conducted herein was not the 'reasonable search for weapons' contemplated by *Terry*. The ring and keys that were seized were not shown by any evidence produced at the hearing to have been taken from the defendant under the belief that they might be a weapon or weapons, and therefore they should not have been removed from the appellant's coat.

"In Tinney v. Wilson, 9 Cir., 408 F.2d 912, a case in which the officer squeezed the pockets of the defendant and felt something which upon extraction from the pocket proved to be pills or capsules, the court held that '[s]ince [the officer's] discovery of the pills or capsules in Tinney's pocket did not follow lawful arrest and resulted from an unconstitutional extension of his "frisk" for possible weapons, it follows that *any "fruit" of this search should have been excluded from Tinney's trial.*' (Emphasis added.)

"The right to 'stop and frisk' is not an open invitation to conduct what amounts to an unlimited search incident to arrest, but is, as indicated above, a limited search of the outer clothing for weapons. *Terry, supra;* Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917."

Justice Erickson in People v. Navran, Colo., 483 P.2d 228, on the prosecution's appeal from a suppression order wrote:

"\* \* \* When the officers appeared, the defendant Navran stopped the car, and both defendants got out of the car and offered no resistance. The officers said that they realized that neither of the defendants was the occupant of the residence or any other person known to be a subject of the investigation. Nevertheless, they caused each of the defendants to be spread-eagled against the car and searched. A police officer patted down the defendants' outer clothing and frisked the defendants' inner clothing. In conducting this so-called pat down and frisk of the defendant Navran, the police officer felt a lump in the defendant's shirt pocket. A further search of the contents of the shirt pocket disclosed that the lump was a plastic baggie containing marijuana seeds and a package of roll-your-own cigarette papers. By means of the same procedure, the officer also took a telephone-address book from the defendant Navran and a quantity of cigarette papers from the defendant Niezguski."

"\* \* \* The only facts which supported the officers' suspicion that the defendants were engaged in criminal activity arose out of the defendants' conduct in driving a car into the driveway of a residence where an expected shipment of marijuana was somehow to be delivered. Unlike the situation in People v. Collman, Colo., 471 P.2d 421 (1970), and People v. Lujan, Colo., 475 P.2d 700 (1970), there was no evidence that a criminal offense had actually been committed on the premises. Nor does the record disclose facts which would give the police officers reasonable 'grounds to believe that the defendants had commit-

**12**

ted a criminal offense of any kind. The defendants were not guilty of any traffic infractions, and they were not known violators of any other laws. *See* Roybal v. People, 166 Colo. 541, 444 P.2d 875 (1968). *Cf.,* Wise v. Murphy, 275 A.2d 205 (D.C.Ct.App. March 16, 1971). No claim is made that the defendants had been mentioned by any of the so-called confidential, reliable informants. Further, the surveillance and investigation had been under way for approximately two weeks, and the officers were not even aware of the defendants' existence. These circumstances, coupled with the admission that the police had no basis in fact to search the defendants, make it clear that the search was exploratory only and cannot be sustained. *See* People v. Singleton, Colo., 482 P.2d 978 (announced March 22, 1971)."

\*   \*   \*   \*   \*   \*

"From this trilogy of cases [Terry, Sibron and Peters] we conclude that the authority to make a search without probable cause is limited in the following manner: There must be (a) some reason for the officer to confront the citizen in the first place, (b) something in the circumstances, including the citizen's reaction to the confrontation, must give the officer reason to suspect that the citizen may be armed and, thus, dangerous to the officer or others, and (c) the search must be limited to a frisk directed at discovery and appropriation of weapons and not at evidence in general."

(Bracketed material supplied.)

Again the Colorado court followed *Bueno,* supra, in Finley v. People, Colo., 488 P.2d 883, saying:

"The arresting officers were having supper at a local restaurant when a busboy not personally known to either of them came up and stated that he overheard the defendant and others 'talking about a big deal and a sale of narcotics and showing a large roll of bills,' and also that one party claimed to be a fed-

eral agent. When the defendant and his friends left the restaurant, they were followed by the officers, stopped, and patted down or frisked, with one of the officers recovering a large roll of bills from the defendant's pocket. The persons were then placed in a police car and asked for identification. While questioning the defendant, one of the officers noticed that he mumbled, and appeared to have something in his mouth. When he refused to produce the substance, the officer grabbed him by the throat and ordered him to release the object, which was done. The contents of this cellophane package formed the substance of the charge and conviction herein.

"The defendant argued at trial, and renews that argument in this appeal, that the contraband recovered from his mouth should have been suppressed as evidence by the trial court. We agree, based upon our conclusion that the officers lacked the requisite probable cause to arrest, and thus could not lawfully seize the contraband.

"As a preliminary, we briefly examine the seizure of the roll of bills from the defendant's pocket. It is well established that an officer may conduct a limited search for weapons (a so-called 'pat down' or 'stop and frisk') for his own safety when he is justified in believing that he is dealing with a potentially armed and dangerous individual. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See also* People v. Bueno, Colo., 475 P.2d 702 (1970). In the instant case, not only was there not any evidence that the defendant may have been armed, but the record is also barren of any indication that the roll of bills was removed from the defendant's pocket in the belief that it was a weapon. Quite to the contrary, the testimony of the officer would seem to indicate that he was aware that the bulge was a roll of bills. \* \* \*"

\*   \*   \*   \*   \*   \*

"The roll of bills being illegally seized from the coat of the defendant, it may not be introduced as evidence at trial, nor may it act as an element in forming the basis of probable cause for the subsequent arrest."

See also Kaplan v. Sup. Ct. of Orange County, 6 Cal.3d 150, 98 Cal.Rptr. 649, 491 P.2d 1, but compare United States v. Burrell, D.C.App., 286 A.2d 845.

There are views that stop and frisk is a time honored police practice which has always been distinguishable from the arrest, particularly where the accused is brought in for booking. See the dissenting opinion of Clark, J., in Henry v. United States, 361 U.S. 98 at 106, 80 S.Ct. 168, 4 L.Ed.2d 134; Remington, The Law Relating to "On the Street" Detention, etc., 51 J.Crim.L.C. & P.S. 386. It is historically noteworthy that Chief Justice Warren who wrote the majority of opinions in *Terry, Sibron* and *Peters,* supra, joined in the dissent in *Henry,* supra.

■ We conclude here that Officer Allyson had the right[2] temporarily to detain White and question him. The neighborhood at that hour was not shown to be one at which businesses were open nor were residences nearby. The record is silent as to the crime density of the area. White was stopped and frisked within the scope approved in *Terry.* There Officer McFadden on palpating a pistol in an overcoat pocket removed the gun, took the coat off Terry and searched him further for weapons. The search was protective, not for evidence. State v. Terry, 5 Ohio App. 2d 122, 214 N.E.2d 114.

However, as we consider the cited cases demonstrate once the officer is safe (i. e., the frisk fails to reveal any weapon) no

further rummaging is warranted.[3] Act No. 157 is not a "stop and frisk" act.

It results that the marijuana cigarette should have been excluded from evidence. Without this the State did not make out its charge.

Therefore the judgment below is due to be reversed and the cause remanded for new trial.

Reversed and remanded.

TYSON and HARRIS, JJ., concur.

ALMON, J., concurs in result.

DeCARLO, J., dissents.

---

2. That is, his testimony gave "specific and articulable facts which, taken together with rational inferences from those facts, reasonably" warranted the intrusion into White's privacy. While some of Allyson's testimony was conclusory only, yet on balance he gave enough objective facts to support his determination to stop White and to search him. La Fave, Street Encounters and the Constitution, 67 Mich.L.R. 39 at 71–72.

3. In *Sibron,* it will be recalled, the officer did not begin by searching for arms, but rather put his hand in Sibron's pocket.