[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 76 
The appellant, George Ester Warren, Jr., was convicted of the unlawful possession of cocaine, a violation of § 13A-12-212, Ala. Code 1975. He was sentenced to eight years' imprisonment. On appeal, Warren contends that the cocaine found in a small plastic container on his person was seized in violation of his Fourth Amendment rights and, therefore, that the trial court erred in denying his motion to suppress the cocaine evidence.
I. Standard of Review
Because the facts material to Warren's motion to suppress were undisputed, our review of the trial court's application of law to those undisputed facts is de novo. State v. Hill, 690 So.2d 1201, 1203 (Ala. 1996).
II. Facts
John Toney, a captain in charge of the narcotics division of the Opelika Police Department, testified that on the afternoon of August 14, 1996, he received a telephone call from a confidential informant who told him that he was, at that moment, watching "four or five black males" who were standing around a white, "late '70s, early '80s model Nissan or Datsun" automobile parked in front of a residence on 548 Hardaway Circle and who were "possessing and selling narcotics from that car." (R. 102-04.) The informant told Captain Toney that he did not know the men, and he described them as "just the usual drug dealers." (R. 104.) He was able to provide Captain Toney with the license plate number of the white automobile, except for one letter.
Captain Toney testified that the informant was known to him and had on several occasions provided him with reliable information concerning illegal drug activity. Although Captain Toney was unsure whether the informant's prior tips had led to any arrests, he stated that he was unsure because the persons whom the informant had previously identified as participants in drug transactions "would always run" when approached by the police acting *Page 77 
on those tips. (R. 99.) Captain Toney explained why he considered the informant to be reliable:
 "[B]ased on the fact that we would respond — and the people would be there as described by the informant — however, we weren't able to catch them — we felt like the fact that they would run probably indicated that he was telling the truth."
(R. 102.)
After receiving the telephone tip from the informant on August 14, Captain Toney promptly relayed the information to Greg Wilson, a plainclothes detective with the police department's narcotics division, and instructed Detective Wilson to proceed to 548 Hardaway Circle to investigate. Without delay, Detective Wilson, accompanied by two other detectives, drove an unmarked police car to the given address on Hardaway Circle, where he saw four or five black males standing around a white car that matched the description the informant had provided to Captain Toney. After determining that the license plate number on the white car matched the partial tag number provided by the informant, Detective Wilson radioed for assistance and pulled his vehicle up to the white car. Detective Wilson and the two other detectives then got out of their vehicle and approached the men standing around the white car. One of those men was Warren.
Detective Wilson testified that after he and his fellow detectives identified themselves as police officers, they conducted "field interviews" of the men, which consisted of asking them their names and requesting to see their driver's licenses. At some point during the field interviews, the police officer whom Detective Warren had summoned on his radio also arrived on the scene. For their safety, the detectives and the officer determined to pat the men down for weapons. Detective Wilson conducted the patdown of Warren.
Detective Wilson testified that as he patted down the outer surface of Warren's clothing, he felt a small object in Warren's right front pants pocket that he immediately recognized as a "plastic box or container . . . like a candy container." (R. 120, 153.) Detective Wilson then reached into Warren's pocket and removed the object. When Detective Wilson removed the object from Warren's pocket, he found that it was a clear plastic container that contained several small rocks of what appeared to be crack cocaine. Warren was arrested for possession of cocaine.
The record indicates that the container retrieved from Warren's pocket was a small, clear plastic container ordinarily used to package "Tic-Tac" breath mints. (R. 144, 180, 190.) Forensic testing revealed that the small rocks found in the plastic container were crack cocaine.
Detective Wilson testified that he reached into Warren's pocket to retrieve the plastic container because, "[t]hrough my experience as being an investigator in narcotics, I believed that it did, in fact, contain drugs because I have run across the same type plastic containers in the past that have come off defendants that did, in fact, hold cocaine." (R. 120-21.) Detective Wilson estimated that on 4 or 5 occasions during the approximately 50 patdowns he had conducted during the previous 16 months, he had found similar plastic containers containing narcotics and stated that he had also recovered similar containers containing narcotics "from other defendants that were not taken from a patdown." (R. 162.)
Although the trial court, when denying Warren's motion to suppress, found that the plastic container recovered from Warren's pocket was approximately the size of a box of razor blades, the record reflects *Page 78 
that Detective Wilson stated, on both direct and cross-examination, that he reached into Warrens's pocket to retrieve the container because he believed it contained narcotics and not because he believed the container was a weapon or that it might contain something that could be used as a weapon.
III. Issues Raised by Warren
Warren argues (1) that under Terry v. Ohio, 392 U.S. 1 (1968), the police lacked a reasonable suspicion to justify the initial investigatory stop on the street and (2) that, even if the initial investigatory stop was justified under the circumstances, Detective Wilson's act of reaching into Warren's pants pocket to retrieve the plastic container containing the cocaine exceeded the legitimate scope of a protective patdown permitted under Terry.
IV. Discussion
Subject to certain specifically established exceptions, searches conducted "`outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment.'" Thompson v. Louisiana, 469 U.S. 17, 19-20 (1984), quoting Katz v. United States, 389 U.S. 347, 357 (1967). See Ex parte Hilley, 484 So.2d 485
(Ala. 1985). One exception is the investigatory stop and protective patdown (commonly called the "stop and frisk") situation recognized by the United States Supreme Court in Terry v. Ohio.
In Terry, the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," the officer may conduct a brief investigatory stop of the suspicious person and make "reasonable inquiries" aimed at dispelling his suspicions. 392 U.S. at 30; see Huffman v. State, 651 So.2d 78, 79 (Ala.Cr.App. 1994). See also Adams v. Williams, 407 U.S. 143, 145-46 (1972). An investigatory stop does not violate the Fourth Amendment if an officer has a "reasonable suspicion," supported by particular and articulable facts, that a person he encounters has been engaged in, is currently engaged in, or is about to engage in criminal activity. Terry, 392 U.S. at 21; see Hill, supra, 690 So.2d at 1204-05.
The Supreme Court further held in Terry that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may, for purposes of protection, conduct a limited patdown of the individual "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24; see Huffman, 651 So.2d at 79-80. The purpose of a protective patdown "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." Adams, 407 U.S. at 146; see Terry, 392 U.S. at 26-27.
A. Justification for the Investigatory Stop
Warren argues that the investigatory stop by the police was unlawful because, he says, the police lacked a reasonable suspicion to believe he had been involved in criminal activity, as required by Terry.
In Alabama v. White, 496 U.S. 325 (1990), the United States Supreme Court recognized:
 "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable *Page 79 
suspicion can be established with information that is different is quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."
496 U.S. at 330. See Hill, 690 So.2d at 1204.
In determining whether an investigatory stop is supported by a reasonable suspicion:
 "[T]he totality of the circumstances — the whole picture — must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal.
 ". . . The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person."
United States v. Cortez, 449 U.S. 411, 417-18 (1981) (citations omitted).
It is well settled that the reasonable suspicion required to justify an investigatory stop may derive from information supplied by an informant if the information manifests sufficient indicia of reliability. Adams,407 U.S. at 146. As the Alabama Supreme Court has stated:
 "Information provided by a reliable informant can provide the reasonable suspicion required to justify a Terry stop. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In Alabama v. White, supra, the United States Supreme Court recognized that the same considerations relevant in determining whether an informant's tip gives rise to probable cause are also `relevant in the reasonable-suspicion context, although allowance must be made in applying them for the lesser showing required to meet that standard.' White, 496 U.S. at 328-29, 110 S.Ct. at 2415. Under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), in order for an informant's tip to form the basis of a probable cause finding the prosecution had to satisfy a two-pronged test of proving (1) an informant's `veracity' or `reliability' and (2) the informant's `basis of knowledge.' See, e.g., Ex parte Meeks, 434 So.2d 844 (Ala. 1983); Knight v. State, 346 So.2d 478 (Ala.Cr.App. 1977), cert. denied, 346 So.2d 483 (Ala. 1977); see also H. Maddox, Alabama Rules of Criminal Procedure § 3.9 (1990). But in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court adopted a more flexible `totality of the circumstances' approach, under which an informant's `veracity' or `reliability,' and `basis of knowledge' are highly relevant factors in determining whether probable cause exists, allowing consideration of other factors, such as corroboration by independent police work. In addition, under Gates, `a deficiency in one [of the two Spinelli factors, "veracity" or "reliability," and "basis of knowledge,"] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.' 462 U.S. at 233, 103 S.Ct. at 2329. See also Ex parte Carpenter, [592 So.2d 627 (Ala. 1991)]."
Hill, 690 So.2d at 1204-05.
We find that the facts of this case created a reasonable suspicion that justified the *Page 80 
investigatory stop of Warren, based on the information received from the informant and the independent police verification of the informant's information. The informant was shown to be reliable by Captain Toney's testimony that the informant had on several occasions provided him with reliable information concerning illegal drug activity. The basis of the informant's knowledge in this case was firsthand; Captain Toney's testimony indicated that the events the informant related to him in the telephone call were being observed by the informant as the telephone call was being made. Moreover, the content of the informant's information "describe[d] the accused's criminal activity in sufficient detail . . . [for the police officer to] know that he is relying on something more substantial than a casual rumor circulated in the underworld or an accusation based merely on an individual's general reputation." Spinelli v. United States, 393 U.S. 410 (1969). The informant supplied Captain Toney with an estimate of the number of suspects and indicated their race. He further supplied the location of the car the suspects were standing around, and from which they were allegedly "possessing and selling narcotics." In addition, the informant described the car by make, year, and color and was able to provide a partial license plate number. This is "`sufficient information'" from which it can be "`reasonably infer[red] that the informant had gained his information in a reliable way.'" Lamar v. State, 578 So.2d 1382, 1383 n. 1 (Ala.Cr.App.), cert. denied, 56 So.2d 659 (Ala. 1991), quoting Moynes v. State, 568 So.2d 392, 394 (Ala.Cr.App. 1990).
The facts further reflect that Detective Wilson, to whom Captain Toney had relayed the informant's information, arrived at the location designated by the informant only minutes after the informant's telephone call to Captain Toney. Detective Wilson's own observations upon arriving at the designated location verified many of the details given by the informant, including the estimated number of suspects and the race of the suspects; the fact that the suspects were gathered around a car; the make, year, and color of the car; and the car's partial license plate number. While these details consisted largely of facts of a sort readily available to the public and were not predictive of future behavior, we believe, applying the lesser standard of suspicion required for a Terry stop, that the informant's information, in conjunction with the police verification, exhibited sufficient "indicia of reliability" to support the suspicion that Warren had recently engaged in or was currently engaged in criminal activity and to justify the investigatory stop of Warren.
B. Justification for Initiating the Protective Patdown
On appeal, Warren does not specifically challenge Detective Wilson's justification for initiating the protective patdown after his investigatory stop. Without belaboring the issue, we note that the Supreme Court held in Terry that to justify a patdown, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."392 U.S. at 27. Here, Detective Wilson was informed by Captain Toney that the confidential informant had seen the suspects selling narcotics from a car. It has been recognized that "weapons and violence are frequently associated with drug transactions." United States v. Brown, 913 F.2d 570,572 (8th Cir.), cert. denied, 498 U.S. 1016 (1990). See also Michigan v. Summers, 452 U.S. 692, 702, 101 S.Ct. 2587, 2594 (1981) ("the execution of a *Page 81 
warrant to search for narcotics is the kind of transaction that may give rise to sudden violence"); United States v. Salazar,945 F.2d 47, 51 (2d Cir. 1991), cert. denied, 504 U.S. 923 (1992) (police "know that narcotics dealers frequently carry weapons"); United States v. Salas, 879 F.2d 530, 535 (9th Cir.), cert. denied, 493 U.S. 979 (1989) ("[i]t is not unreasonable to assume that a dealer in narcotics might be armed"); United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988), cert. denied, 488 U.S. 1033 (1989) (guns are "tools of the trade" of drug dealers); Wartberg v. State, 586 So.2d 627 (La.Ct.App. 1991) ("[T]hese officers were satisfied that they had seen a drug transaction and they were dealing with four drug suspects in an automobile. It would be reasonable to infer that such subjects would be armed and dangerous."); and State v. Richardson, 156 Wis.2d 128, 456 N.W.2d 830 (1990) ("drug dealers and weapons go hand in hand"). Although Detective Wilson was being assisted by two other detectives and an additional officer at the time he conducted the patdowns of Warren and the other suspects, the record reflects that there were as many as five suspects at the scene.
Moreover, the record suggests that Detective Wilson was apparently concerned enough for his safety and the safety of his fellow detectives to radio for assistance from the additional officer when he pulled his vehicle up to the suspects. Under the circumstances, we find that it was reasonably prudent for Detective Wilson to initiate the protective patdown of Warren.
C. Lawful Scope of the Patdown
Warren argues that even if Detective Wilson was authorized to make the initial investigatory stop and to initiate the protective patdown, Detective Wilson's act of reaching into his pants pocket to retrieve the plastic container that contained the cocaine exceeded the lawful scope of a protective patdown under Terry because, he says, at the time Detective Wilson reached into the pocket, he did not believe that the object he had detected was or could be a weapon. In its brief to this court, the state maintains that Detective Wilson's actions throughout his encounter with Warren were constitutionally sound, arguing that at the point Detective Wilson removed the plastic container from Warren's pocket and saw that it contained several small rocks of what appeared to be crack cocaine, "reasonable suspicion ripened into probable cause for seizing the container and arresting appellant." (State's brief at p. 12.) The state's argument, however, begs the question whether Detective Wilson was within the lawful scope of a protective patdown when he reached into Warren's pocket to retrieve the container.
Under Terry, the lawful scope of a protective patdown is limited to "those areas in which a weapon may be placed or hidden." Michigan v. Long, 463 U.S. 1032, 1049 (1983). "The sole justification" of the patdown under Terry is "the protection of the police officer and others nearby." 392 U.S. at 29. If a patdown exceeds the bounds of what is necessary to determine whether the suspect is armed, it amounts to the sort of exploratory search that Terry expressly refuses to authorize, see 392 U.S. at 25-30, and the fruits of the search must be suppressed. Sibron v. New York, 392 U.S. 40, 65-66 (1968). See, e.g., Ford v. State, 680 So.2d 948, 951 (Ala.Cr.App. 1995), cert. denied, 680 So.2d 952
(Ala. 1996).
Generally, Terry limits the permissible scope of a protective patdown to "a carefully limited search of the outer clothing" *Page 82 
of a suspect; 392 U.S. at 30 (emphasis added); that limited search is designed to discover weapons that could be used to assault an officer. "If during a lawful patdown an officer feels an object which obviously is not a weapon, further `patting' of it is not permissible." 4 W. LaFave, Search and Seizure § 9.5(b) at 275 (3d ed. 1996). Thus, an officer may intrude beneath the outer surface of a suspect's clothing and still remain within the lawful bounds of a protective patdown under Terry only if, while patting the outer surface of the clothing, he comes upon something he reasonably suspects may be a weapon.
Applying this standard to the facts before it, the Supreme Court in Terry stated:
 "The scope of the search [the protective patdown] in this case presents no serious problem in light of these standards. Officer McFadden patted down the outer clothing of petitioner and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his patdown which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find."
392 U.S. at 29-30.
In White v. State, 49 Ala. App. 5, 267 So.2d 802 (1972), this court held that an officer's reaching into a pocket during a patdown for an object that the officer knows is not a weapon exceeds the scope of Terry. This court also held that an officer cannot go beyond "patting or frisking" unless the pat down or frisk reveals "the possession of a dangerous weapon." 267 So.2d at 805. See also McDaniel v. State,555 So.2d 1145, 1147 (Ala.Cr.App. 1989), cert. denied, 498 U.S. 810
(1990).
As we have stated, Detective Wilson acted lawfully in making the initial investigatory stop of Warren and in undertaking the protective patdown of Warren. The record further reflects that Detective Wilson was still within the lawful bounds of a protective patdown when he detected the plastic container in Warren's pocket, but before he reached into Warren's pocket. However, Detective Wilson's own testimony belies any inference that his reaching into Warren's pocket to retrieve the plastic container was part of a protective search. Detective Wilson was straightforward in stating that he reached into Warren's pocket to retrieve the container because he believed it held narcotics, not because he suspected that it was a weapon. Although the trial court found that the container was approximately the size of a box of razor blades — suggesting, presumably, that the container could have held an item that was potentially dangerous to Detective Wilson or to others present — we find that there was no factual determination to be made by the trial court on this question, in view of Detective Wilson's uncontroverted testimony that he was unconcerned that the container, or something inside the container, might be a weapon. Thus, Detective Wilson's intrusion into Warren's pocket to retrieve the container fell outside the purpose of the protective patdown authorized by Terry. However, it is still possible that Detective Wilson's seizure of the plastic container may have been legally justified on a different basis.
D. "Plain-Feel" Doctrine
In Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130,124 L.Ed.2d 334 *Page 83 
(1993), the United States Supreme Court considered "whether police officers may seize nonthreatening contraband [e.g., illegal narcotics] detected during a protective patdown search of the sort permitted by Terry." 508 U.S. at 373. Specifically, the Court addressed the question "whether contraband detected through the sense of touch during a patdown search may be admitted in evidence." 508 U.S. at 371. The Court's answer was yes, so long as the officer who conducted the search was "acting within the lawful bounds marked by Terry at the time he gained probable cause to believe that the [item detected in the patdown] was contraband." 508 U.S. at 378. See Huffman, supra, 651 So.2d at 80. Analogizing to the "plain-view" exception to the Fourth Amendment's warrant requirement and articulating a "plain-feel" doctrine,[1]
the Court in Dickerson stated:
 "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context . . . .
 ". . . Terry itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of Terry, after all, is that officers will be able to detect the presence of weapons through the sense of touch and Terry upheld precisely such a seizure. Even if it were true that the sense of touch is generally less reliable than the sense of sight, that only suggests that officers will less often be able to justify seizures of unseen contraband. Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures."
508 U.S. at 375-76 (footnote omitted; emphasis added).
Because the Supreme Court in Dickerson made it clear that the plain-feel doctrine is a corollary to the plain-view exception — where probable cause is required (see, e.g., Arizona v. Hicks, 480 U.S. 321
(1987)) — this court has recognized that the phrase "immediately apparent," as it is used in Dickerson, is the equivalent of "probable cause." See Allen v. State, 689 So.2d 212, 215-17 (Ala.Cr.App. 1996). In other words, to say that the identity of the object must be "immediately apparent" means that the officer has probable cause to believe that the object he or she feels during the course of a protective patdown is contraband; this probable cause must arise while the officer is still acting within the legitimate bounds of a protective patdown. Allen, 689 So.2d at 216-17; see Dickerson, 508 U.S. at 376. "It is fully consistent with constitutional principles to construe the `immediately apparent' requirement to allow the seizure of contraband based on probable cause acquired during a Terry patdown . . . so long as the probable cause arises while the patdown is still justified." Allen, 689 So.2d at 216-17 (emphasis added); see Dickerson, 508 U.S. at 376 ("the Fourth Amendment's requirement that the officer have probable cause to *Page 84 
believe that the item is contraband before seizing it ensures against excessively speculative seizures"). Within the context of the "plain-feel" doctrine, then, an officer exceeds the legitimate scope of a protective patdown if the officer continues to manipulate or seizes an object felt through a suspect's clothing after he is convinced that what he has felt was not a weapon. Allen, 689 So.2d at 216-17; see Dickerson,508 U.S. at 378-79.
It is well settled that probable cause may arise from a combination of several factors: "Whether there is probable cause to merit a warrantless search and seizure is to be determined by the totality of the circumstances." State v. Stallworth, 645 So.2d 323, 325 (Ala.Cr.App. 1994) (emphasis added); see Illinois v. Gates, 462 U.S. 213 (1983). "The facts giving rise to probable cause must be viewed in the light of the officer's own experience and training." Allen, 689 So.2d at 216. Thus, in cases where the "plain-feel" doctrine is a consideration, the officer, in making the probable cause determination, is not required to "bracket off" the information acquired through his sense of touch from the information he has acquired from other sources. We implicitly recognized this in Allen, supra, where the officer, during a protective patdown of the defendant's outer clothing, moved his hand over an envelope in the defendant's pocket in an effort to determine whether the envelope contained a razor blade and, in so doing, felt a leafy substance in the envelope that he believed to be marijuana. This court considered whether the officer was still acting within the lawful bounds of a protective patdown under Terry when he "acquired the information, through touch and through his observation of other attendant circumstances, that gave him probable cause to believe that what he felt through the appellant's clothing — the envelope and its contents — was contraband." Allen, 689 So.2d at 215 (emphasis added).
"`Probable cause exists where all the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed and that contraband would be found in the place to be searched.'" Stallworth, 645 So.2d at 325, quoting Sheridan v. State, 591 So.2d 129,130 (Ala.Cr.App. 1991). Probable cause does not require certainty, but rather requires a substantial probability of criminal activity. Gates,462 U.S. at 243-44 n. 13. See Allen, 689 So.2d at 216 ("Sufficient probability, not certainty . . ., is the touchstone under the Fourth Amendment.").
The question here is whether, under Dickerson's plain-feel doctrine, Detective Wilson's tactile perception of the plastic container while patting the outer surface of Warren's pocket, combined with the attendant circumstances known to Detective Wilson at that time, provided Detective Wilson with probable cause to believe that the plastic container held illegal narcotics before he reached into Warren's pocket to retrieve the container.
We conclude that, upon patting the outer surface of Warren's pants pocket and immediately recognizing the object therein to be a plastic container, Detective Wilson had, under the totality of circumstances, probable cause to believe that the plastic container contained illegal narcotics. The following facts support our conclusion: (1) Captain Toney received information from a known informant that four or five black males were standing around a car that was parked in front of a specific address and were selling narcotics from the car; (2) the informant had provided Captain Toney with reliable information in the past concerning *Page 85 
persons apparently involved in illegal drug transactions; (3) the basis of the informant's knowledge in the present case was firsthand, as the events the informant related to Captain Toney over the telephone were being observed by the informant as the telephone call was being made; (4) although the informant did not know the men involved in the apparent drug activity, his description of the men and the car they were standing around contained ample detail — down to a partial license plate number for the car; (5) Captain Toney relayed the contents of the informant's tip to Detective Wilson, who arrived at the location designated by the informant within minutes of the informant's telephone call; (6) Detective Wilson's own observations upon arriving at the designated location verified many of the details supplied by the informant, including the number of suspects involved in the alleged drug activity, the race of those suspects, the fact that they were gathered around a car of a particular make, year, and color, and the car's partial license plate number; (7) while conducting an authorized protective patdown of Warren, who was among the group of men standing around the car, Detective Wilson encountered an object in Warren's pants pocket that he immediately recognized as a plastic container; (8) Detective Wilson was aware, based on his experience as a narcotics investigator, that illegal narcotics, in particular cocaine, are often carried in the type container that he felt on Warren's person; and (9) Detective Wilson provided ample testimony concerning his experience in narcotics cases and the basis for connecting the plastic container with the possession of cocaine.
We note that in People v. Champion, 452 Mich. 92, 549 N.W.2d 849
(1996), cert. denied, 519 U.S. 1081, 117 S.Ct. 747 (1997), the Michigan Supreme Court reached the same conclusion based upon facts similar to those in this case. In Champion, the Court held that the following facts provided the officer with probable cause to seize a pill bottle that he felt, between the defendant's leg and groin area, through the defendant's clothing while conducting a protective patdown: (1) the officer, who was patrolling a high drug-crime area, observed the defendant get out of a car and walk away upon seeing a patrol car and uniformed police officers; (2) the officer recognized the defendant and knew of his previous convictions for drug and weapons offenses; (3) the defendant had his hands tucked inside the front of his sweatpants and refused to take his hands out of his sweatpants despite being repeatedly asked to do so by the officer; and (4) the officer testified that he had considerable experience in drug cases and was aware that controlled substances are frequently carried in pill bottles like those he felt while patting down the defendant.
Likewise, in Salazar, supra, 945 F.2d 47, a case that was decided before Dickerson and that was cited in a footnote in Dickerson, the United States Court of Appeals for the Second Circuit found probable cause for the seizure of plastic vials containing crack cocaine from inside the defendant's coat pocket based on the following facts: (1) drug agents had received a tip from a first-time informant that the defendant was selling crack cocaine from a specific address; (2) the agents verified certain of the details of the informant's tip; (3) the defendant appeared nervous upon seeing the agents; and (4) an agent testified that during his protective patdown of the defendant, he felt through the defendant's clothing the "crackling of plastic" that he recognized, from prior experience, as plastic vials commonly used for holding crack cocaine. The Court stated in Salazar, "Where the officers have been informed that a given person is dealing in *Page 86 
narcotics, and during a permissible patdown for weapons they feel something that their experience tells them is narcotics, the patdown gives them probable cause to search the suspect for drugs." 945 F.2d at 51.
For the reasons stated above, we hold that the trial court properly denied Warren's motion to suppress. The judgment of the trial court is affirmed.
AFFIRMED.
McMillan, Cobb, and Baschab, JJ., concur; Brown, J., recuses.
[1] The Court in Dickerson stated that most state and federal courts had actually already recognized the plain-feel doctrine, 508 U.S. 371 n. 1.