**Thomas J. BALLOU, Jr., Petitioner, Appellant,**

v.

**COMMONWEALTH OF MASSACHU-SETTS et al., Respondents, Appellees.**

**No. 6892.**

United States Court of Appeals First Circuit.

Dec. 3, 1968.
Certiorari Denied March 10, 1969.

See 89 S.Ct. 1024.

Henry N. Berry, III, Portland, Me., by appointment of the Court, with whom Gagan, Trynor, Berry & Cummings, Portland, Me., was on brief, for appellant.

Willie J. Davis, Asst. Atty. Gen., with whom Elliot L. Richardson, Atty. Gen., was on brief, for appellees.

Before ALDRICH, Chief Judge, STALEY*, Senior Circuit Judge, COFFIN, Circuit Judge.

COFFIN, Circuit Judge.

This appeal from the district court's denial of a petition for habeas corpus presents a question of the propriety of police-conducted search of petitioner's person.

On September 14, 1965, at 12:45 p.m., Detective McLean received a telephone call at Boston Police Headquarters from an unidentified informant. The informant asked to speak with Detective-Sergeant Lynch, who had formerly been as-

signed to the Charlestown area. Upon learning that Detective Lynch was unavailable, but that McLean was Lynch's partner, the informant told Detective McLean that "Buddy McLean, Ballou, and Winters or Winston were in Driscoll's Cafe on Medford Street in Charlestown [and that] they all had guns." Though asked, the informant declined to give his name.

The informant's message was then transmitted by Detective McLean through Sergeant Sweeney at Headquarters to Captain Bulens in Charlestown. In the transmittal, the identity of the cafe was lost, Bulens being told only that Ballou, McLean, and a third person were at a "joint in Charlestown". Both Sweeney and Bulens knew that Ballou had served time in prison on a gun carrying charge; that he was a friend of Buddy McLean, a leader of a faction involved in a current gang war with a McLaughlin faction which had already resulted in some killings; and that Ballou was known to carry a gun. Bulens also had information that McLean was known to carry a gun.

Captain Bulens, accompanied by Detective Ingemi, proceeded to Driscoll's Cafe (after stopping at several other such places) and approached Ballou and Buddy McLean who were standing on the sidewalk in front of the cafe. Detective Ingemi first approached McLean in the doorway and searched him with his permission, finding no weapons. Then Ingemi rejoined Ballou and Captain Bulens who "patted down" Ballou without his permission and found a .38 caliber revolver stuck inside his belt.[1]

Ballou was tried and convicted of carrying a concealed revolver. A timely motion to suppress the revolver was denied by the trial court and this denial was affirmed on appeal. Having exhausted his state remedies, petitioner sought relief on habeas corpus in the federal district court. It is from the de-

* Of the Third Circuit, sitting by designation.

1. This court, as did counsel, adopts the findings of fact made by Judge Tauro in Commonwealth v. Ballou, Mass.Super. Ct., No. 20931, February 25, 1966.

nial of that petition that this appeal is taken.

Petitioner challenges his conviction on the ground that it was based on evidence which was the product of an unlawful search. Specifically, petitioner argues that the search was violative of the Fourth and Fourteenth Amendments of the Constitution in that it was not incident to a lawful arrest.

The Commonwealth's position is that there was probable cause for arrest thereby justifying a search incident thereto, and alternatively, even if probable cause was lacking, the search must be upheld on the authority of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968), and Sibron v. New York, 392 U.S. 40, 41, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968).

The justification for this warrantless search must rest either on the ground that it was a search incident to an arrest for which there was probable cause or a limited search in an on-the-street encounter based on reasonable suspicion as defined in Terry v. Ohio, supra. We do not confront here, as we did in Niro v. United States, 388 F.2d 535 (1st Cir. 1968), a situation where police officers demonstrably had time to procure a warrant but failed to do so.

▮ In considering whether there was probable cause for arrest without a warrant, our first inquiry must be whether the arrest preceded the search, and if it did not, whether any significance can be attributed to this fact. It is clear that a search may not precede an arrest and thereby serve as justification for arrest. Sibron v. New York, supra, 392 U.S. at 67, 88 S.Ct. 1912. That is not to say, however, that if an arrest is justified, it must in all cases precede a search. Indeed, in many cases it will not be possible to pinpoint the time of arrest. In any event, in the present case if there was probable cause for arrest a self-protective search prior to arrest would have been justified.[2]

The existence of probable cause in this case is arguable. cf. Recznik v. City of Lorain, Nov. 18, 1968, 393 U.S. 166, 89 S.Ct. 342, 21 L.Ed.2d 317. No one of the relevant precedents exactly matches the factors present here. For we are concerned with the extent to which hearsay evidence, specifically hearsay from an informer unknown even by the police, conjoined with other facts, can rise to the level of probable cause. The Supreme Court has sanctioned the use of information from undisclosed informants in a number of cases. See e. g., McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). All of these cases where probable cause was held to have existed involved both an informer known to the police as having given reliable information in the past and the giving of specific information which was corroborated in the course of police follow-up on the tip. In this case the informer was unknown, even though the information as to the location of named people at a specific location and time proved to be accurate.

In the circumstances of this case, what is the significance of the lack of identity and proven reliability of the informer? While we observe that an informer's first tip must always be without the force of prior reliability, and thus that this reason for acceptance has a kind of boot-strap effect, we acknowl-

2. In this case, Captain Bulens testified that he considered Ballou to be under arrest before he came within five feet of him. But no communication to this effect was made and no physical restraint imposed. We consider the record on this point to lie in the same posture as that in Terry v. Ohio, supra, where the Court said, 392 U.S. at 19 n. 16, 88 S.Ct. at

1879: "We cannot tell with any certainty upon this record whether any such 'seizure' took place here prior to Officer McFadden's initiation of physical contact for purposes of searching Terry for weapons, and we may thus assume that up to that point no intrusions upon constitutionally protected rights had occurred."

edge that there are other ways of accrediting reliability than by acting on faith—e. g., by surveillance and stake-out to verify the informer's tip. But even if Detective-Sergeant Lynch had received the call from the informant in this case—who had asked for him by name and title and presumably because of his past assignment to Charlestown —if the informant had identified himself, and if Lynch had been able to say the informant had proven reliable in the past, would this have added measurably to the probable cause content of the tip? Our answer is that it would if the information related to individuals unknown to the police. But where the individuals, their records, roles in gangland warfare, and propensities for gun carrying were familiar to the police, and where the information as to where they could be found proved accurate, we are not overly impressed by the missing factor of proven reliability. Indeed, the Supreme Court refers to the need for "specificity in the information" acted on by the police as "the central teaching" of Fourth Amendment doctrine. Terry v. Ohio, supra, at 21, n. 18, 88 S.Ct. 1868.

Yet, having said all this, we do not decide this issue, deeming that reasonable suspicion existed to justify the limited, pat-down search of Ballou.

■ Indeed, this case seems to us part of that "protean variety of the street encounter", Terry v. Ohio, supra, at 15, 88 S.Ct. at 1876 for which a "narrowly drawn authority" to engage in a limited search for weapons exists when an officer, on the basis of "specific reasonable inferences which he is entitled to draw from the facts in light of his experience", has "reason to believe that he is dealing with an armed and dangerous individual". 392 U.S. at 27, 88 S.Ct. at 1883.

■ True, this case, unlike Terry, did not involve "unusual conduct" observed on the street by an officer. But it seems clear to us that the tip in the light of the visual corroboration and the reality of a gangland feud were at least the equivalent of the parading by the store window observed in Terry. A tip that three men, all armed, including one leader of a gangland faction currently embroiled in a series of killings, and one associate with a gun carrying record, were meeting together at a cafe, posed just as much a challenge for swift action to the Boston police as to Officer McFadden in Terry. There were four possible responses which could have been made to the anonymous tip. The police could have done nothing, since the informer was without credentials or identity; this, in the light of police knowledge about the individuals and the all too real possibility of gangland violence, would not appear to be reasonable. The police could have instituted surveillance. This might have been the proper course in some cases but here the two suspects were thought to be armed and more immediate and direct action was required. A third possibility would have been to arrest the two suspects; but this, as we have noted, might have been a response disproportionate to the information at hand. The course of action decided upon here—to follow up the tip and investigate—was properly responsive to all the information the officers possessed and the governmental interests of crime prevention and detection. Failure to have investigated would, to use the Court's words in Terry, supra, at 23, 88 S.Ct. at 1881, "have been poor police work indeed".

This leads to the question whether there was justification for the invasion of Ballou's person. Unlike the situation in Terry where the officer inferred the possible presence of weapons on the suspects, or that in Sibron where the officer was not acquainted with the suspect and had no reasonable grounds to believe he was armed, the sole focus of suspicion here was that the suspects were armed. Cf. Terry v. Ohio, supra, 392 U.S. at 36, 88 S.Ct. 1868 (Douglas, J., dissenting).

■ Counsel for petitioner argued that, McLean having been searched with

his permission and being found to be without a weapon, any justification for patting down Ballou disappeared. We are not tempted to second guess an officer dealing in a tense situation with a dangerous suspect. While Captain Bulens might have concluded that, one man not being armed, the other also was not, he might also more prudently have concluded that there was a good chance that Ballou was armed and that any further delay in disarming him might prove disastrous. Captain Bulens, in waiting for Ingemi to seek and gain McLean's permission to search him, acted no more precipitately or unreasonably than did Officer McFadden in asking Terry's name and, after Terry "mumbled something", frisking him. Moreover, unlike the action of Patrolman Martin in *Sibron*, Captain Bulens did not do more initially than pat the outer clothing of Ballou.

We are not insensible to the possibility of capricious harassment of individuals confronted on the street by police officers stimulated to act by an anonymous tip. We say, first, however, that such a tip must be linked to other facts known by the police, such as those present here, to create the prerequisite reasonable suspicion that "criminal activity may be afoot and that the persons with whom [the police are] dealing may be armed and presently dangerous". Terry v. Ohio, supra, at 30, 88 S.Ct. at 1884. Secondly, to the argument that tips may stem from informants motivated by spite or desire for revenge, we observe that even "reliable" or paid informers may be so motivated and that the critical question is the accuracy of the tip, to be assured both by its specificity and capability of being substantially corroborated by observation. Finally, of course, there is the possibility that an unscrupulous officer could manufacture a tip which would allow him to do what he otherwise could not do. But even in cases of tips from "reliable" informers, there is ordinarily no verification of the police testimony of reliability; there is always the necessity of

relying to some extent on the good faith of law enforcement officials. This is true even where an officer testifies, as in *Terry*, to having observed unusual conduct on the street. In all such cases, of course, the testimony of the police is subject to cross-examination. Each case must, in the final analysis, be decided on its own facts.

In the case before us, we conclude that the facts found by the court constituted the kind of reasonable suspicion justifying the nature of the search which was conducted.

Affirmed.