**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Raymond ADAMS, Defendant-Appellant.**

**No. 72–1313.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 16, 1973.

Decided May 11, 1973.

Lewis C. Laderer, Jr., South Bend, Ind., for appellant.

William C. Lee, U. S. Atty., Fort Wayne, Ind., Timothy P. McCarthy,

Asst. U. S. Atty., South Bend, Ind., for appellee.

Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

This appeal raises the troublesome problem of a warrantless automobile search. Defendant Raymond Adams was convicted of possession of a sawed-off shotgun which was not registered to him in violation of 26 U.S.C. § 5861(d). He was placed on probation for two years.

## I.

On March 30, 1971, while a racial riot was in progress at Washington High School in South Bend, Indiana, an employee of a gasoline station about three blocks from the school observed three black males approaching a yellow automobile. One of them appeared to be carrying a long shoulder-type weapon, the barrel of which protruded about 12 inches from underneath his jacket. Shortly thereafter the employee, while delivering an automobile to a customer, saw a police officer on the street and told him that he had seen three males who appeared to be armed approaching a yellow automobile.

About that time a South Bend police officer on patrol duty in a marked police car in the area around Washington High School received a radio message to be on the lookout for a yellow car with three male black subjects in it, possibly armed. The officer responded to the call by driving toward the location given in the message of the 4400 block of Western Avenue. As he traveled on Western Avenue, a yellow car with three black males passed him. He made a U-turn and followed them. The two passengers turned around and looked at him, at which time he turned on his red light and siren for three short bursts.

The yellow car did not stop immediately but instead the two passengers bent over as if picking up something or doing something on the bottom of the car. The car stopped after the third siren blast. By that time other police units came on the scene. The three occupants stepped out of the yellow car. As the officer approached the car he observed a bolt-action shotgun on the back seat with the bolt pulled back and one shell locked in the bolt. He further observed a Western style revolver lying on the floor on the driver's side. On the passenger's side of the front seat, he observed what first appeared to be a pipe protruding from underneath the front seat. When he pulled this object out he discovered that it was a twelve-gauge sawed-off shotgun.

The above facts were adduced at a hearing on the defendant's motion to suppress evidence. Defendant also testified at the hearing. He said that when the first officer saw the weapons in the car, he said, "They've got guns" and then "everybody went . . . drawing (their weapons) and body-slapping people against the car and putting handcuffs on." The district court denied defendant's motion to suppress.

## II.

Defendant first argued that the officer's actions in turning on his red light and siren and stopping the car was an arrest, that there was no probable cause to arrest defendant, that consequently the search of the defendant and vehicle was not incident to a valid arrest, and that the court erred in denying the motion to suppress.

Defendant argued that "there is nothing unlawful about a male negro carrying a rifle." A different situation may exist, however, when a male or female, black or white, is carrying a rifle within a few blocks where a racial disturbance is in progress at a high school. The district court found that there was sufficient probable cause for the arrest and search "under the conditions existing at the time of this disturbance in the vicinity." He added:

"I think the officers would be derelict in their duty if under all the cir-

cumstances there at the time and place, the situation then existing, they had done any less."

At the suppression hearing, the gasoline station employee referred to "the riot that was happening at Washington High School at this time." When he first observed defendant with the gun he was about three blocks from the high school. The arresting officer testified at the suppression hearing that he was on patrol duty in the area around Washington High School where "[w]e had a disturbance with the students at the school at that time." He stopped and eventually arrested defendant while he was still within blocks of the high school.

At the trial, the gasoline attendant referred to "the racial riots at Washington High School," whereupon defendant's counsel moved to strike that comment. The trial court said:

"I do not believe that this Motion should be granted because the situation then existing was a part of the background against which the Police were there and acting, but I should say to you, too, that insofar as the Court knows, there is no evidence here in any way tying this defendant with anything that was going on around Washington High School. So all of these facts may be just purely coincidential; that I do not know, but I do want to say that there's nothing suggested here that ties him in here with what was going on at Washington High School, but I cannot erase from the record the fact that it was that day."

Also at the trial, the arresting officer testified that he was on patrol duty in the vicinity of the high school. Another officer at the scene of the arrest testified that "I was in the vicinity of Washington High School along with many other officers as we had some trouble with the students." The disturbance or trouble or riot at the high school was within the personal knowledge of the arresting officers as well as of the informant.

■ The time and place setting of a search is not wholly irrelevant to its validity as defendant would lead us to believe.

In The Appollon, 22 U.S. (9 Wheat.) 159, 164–165, 6 L.Ed. 111 (1824), Mr. Justice Story, commenting upon the existence of probable cause for the seizure of a French vessel, said:

"It has been very justly observed at the bar, that the court is bound to take notice of public facts and geographical positions; and that this remote part of the country has been infested, at different periods, by smugglers, is a matter of general notoriety . . . ."

The Supreme Court found probable cause for the warrantless search of an automobile primarily on the ground that "Grand Rapids is about 152 miles from Detroit and that Detroit and its neighborhood along the Detroit river, which is the international boundary, is one of the most active centers for introducing illegally into this country spiritous liquors for distribution into the interior." Carroll v. United States, 267 U.S. 132, 160, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925). Recently, the Court said in Adams v. Williams, 407 U.S. 143, 147–148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972):

"While properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car *in a high-crime area* at 2:15 in the morning, Sgt. Connolly had ample reason to fear for his safety." (Emphasis supplied.)

■ In other words, we commence our consideration of the validity of the search with the underlying fact that it took place at the time of and within a few blocks of a racial disturbance in progress at a high school. The threshold of probable cause was lowered by this permeating factor. None of the

many cases relied on by the defendant involved a similar circumstance.

Next, we are faced with the fact of a moving automobile. In Coolidge v. New Hampshire, 403 U.S. 443, 459–460, 91 S. Ct. 2022, 2034–2035, 29 L.Ed.2d 564 (1971), the Court said:

"The underlying rationale of *Carroll* and of all the cases that have followed it [1] is that there is

'a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon or automobile for contraband goods, where *it is not practicable to secure a warrant* because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' 267 U.S., at 153, [45 S.Ct. at 285]. (Emphasis supplied.)

"As we said in *Chambers,* [Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419] . . . 'exigent circumstances' justify the warrantless search of 'an automobile *stopped on the highway,'* where there is probable cause, because the car is 'movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' '[T]he opportunity to search is fleeting . . .' (Emphasis supplied.)"

Next, the informant's facts here were not based on "suspicion, belief or mere conclusion," Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), nor upon "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation," Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 27 L.Ed.2d 637 (1969), but upon the informer's "direct observation and personal knowledge." United States v. Squella-Avendano, 447 F.2d 575, 581 (5th Cir.), cert. denied, 404 U.S. 985, 90 S.Ct. 450, 30 L.Ed.2d 369 (1971).

■ Given the atmosphere of the school disturbance, a moving vehicle and the informer's direct observation of an armed person previously entering the vehicle, the suspicious behavior of the two passengers staring at the patrolling police officer and then lowering themselves in their seats as though to conceal something, was undoubtedly sufficient to cause the officer to stop the automobile. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In United States v. Lindsey, 451 F.2d 701, 703 (3rd Cir. 1971), cert. denied, 405 U.S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463 (1972) the Court of Appeals said at page 703:

Applying *Terry* to the case at hand, we believe Marshal Brophy's reactions to the unusual behavior of the defendant were justified. In the context of a possible airplane highjacking with the enormous consequences which may flow therefrom, and in view of the limited time in which Marshal Brophy had to act, the level of suspicion required for a *Terry* investigative stop and protective search should be lowered. Therefore, despite the fact that it may be said that the level of suspicion present in the instant case is lower than in *Terry*, it was sufficiently high to justify Marshal Brophy's acting."

In Ballou v. Commonwealth of Massachusetts, 403 F.2d 982 (1st Cir. 1968), cert. denied, 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969), the police received information that several gangland figures were armed and meeting at a cafe. Although the informer in that case was without credentials or identity, the Court of Appeals said that for the police to have done nothing would not

1. Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

have been reasonable "in the light of police knowledge about the individuals and the all too real possibility of gangland violence." The Court continued at 403 F.2d 985:

"The course of action decided upon here—to follow up the tip and investigate—was properly responsive to all the information the officers possessed and the governmental interests of crime prevention and detection. Failure to have investigated would, to use the Court's words in *Terry,* [392 U.S. at 23, 88 S.Ct. at 1881] 'have been poor police work indeed'."

We conclude that while the suspicious actions of the defendant and his colleague were of less magnitude than in *Terry,* the addition here of the informer's facts, the high school disturbance and the moving automobile were more than adequate to bring the doctrine of *Terry* into play and to justify the officer's initial stop of defendant's automobile. Those facts were undoubtedly also sufficient to justify a frisk of defendant and his companions. At that point, moreover, the officer saw a shotgun and a pistol in plain view and a sawed-off shotgun in partial view. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); Ker v. California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The frisk and automobile search ensued.

As Mr. Justice Harlan said in his concurring opinion in *Terry* at 392 U.S. 34, 88 S.Ct. 1886:

"Officer McFadden's right to interrupt Terry's freedom of movement and invade his privacy arose only because circumstances warranted forcing an encounter with Terry in an effort to prevent or investigate a crime. Once that forced encounter was justified, however, the officer's right to take suitable measures for his own safety followed automatically."

We conclude that the search was a permissible one and that the district court properly denied the motion to suppress since "[t]he recurring questions of the reasonableness of searches" depend upon the "facts and circumstances —the total atmosphere of the case." United States v. Rabinowitz, 339 U.S. 56, 63, 66, 70 S.Ct. 430, 434, 435, 94 L. Ed. 544 (1950).[2]

### III.

The defendant raised two additional issues on appeal.

He contended that his statement to the officer that he owned the sawed-off shotgun, the possession of which is the subject of the indictment and conviction, should have been suppressed because of the failure of the officer to give complete *Miranda* warnings.

The arresting officer and two other officers who were present at defendant's arrest testified at a hearing outside the jury's presence that the arresting officer read the warnings to defendant before questioning him from a card which he carried in his wallet, including "the right to remain silent, right to counsel, and if they haven't got funds to have counsel, that the court will see that they are properly defended." The defendant's counsel requested to see the card and it was shown to him. He did not object to nor cross-examine the officer in regard to the contents of the card nor did he offer it in evidence.

Defendant complained that the card was not offered in evidence by the government and that the defendant was not advised that he had a right to have an attorney present during questioning.

Assuming that the card did not include the warning regarding the pres-

2. It is clear that contraband (defined as an item the possession of which in itself is a crime) may be seized in the course of a legal search. Cf. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The sawed-off shotgun which formed the basis of the offense in the instant case is contraband. See 26 U.S.C. §§ 5841, 5861(d), and 5871; 49 U.S.C. § 781(b)(2).

ence of an attorney, the warnings, as summarized by the officer, were satisfactory under United States v. Lamia, 429 F.2d 373 (2d Cir.), cert. denied, 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970), and United States v. Cusumano, 429 F.2d 378, 380 (2d Cir.), cert. denied, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970), in the latter of which the Court said:

> "It is unrealistic to expect the same degree of formality with respect to waiver and question 'on the street' as in the station-house."

■ Finally, defendant contended that the trial court erred when he refused to give an instruction on the voluntariness of defendant's statement,[3] and instead gave the court's own instruction.[4] We find that the district court complied with 18 U.S.C. § 3501(a).[5]

The judgment of conviction is affirmed.

Affirmed.

SWYGERT, Chief Judge (dissenting).

In finding probable cause to stop Adams under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the majority relies on several facts known to the arresting officers before the car actually came to a halt: "the atmosphere of the school disturbance, a moving vehicle, . . . the informer's direct observation of an armed person previously entering the vehicle, the suspicious behavior of the two passengers staring at the patrolling police officer and then lowering themselves in their seats as though to conceal something." With due deference to my Brothers, I am wholly unpersuaded that these factors, apart or in combination, justified the police stop at issue.

It is manifest that the gas station attendant's observations, as conveyed by him to the police prior to the arrest, did not describe conduct which is illegal under the laws of the State of Indiana.*

3. "Ladies and gentlemen of the jury, before you take into consideration as evidence the statement(s) allegedly made to the South Bend police officers by the defendant you must first find that before making the statement(s) that—(1) defendant was informed he had a right to remain silent and that anything he said could be used against him, and (2) defendant was informed that he had a right to have counsel present at the interview, and (3) defendant was informed that if he could not afford counsel, counsel would be furnished him to be present at the interview without cost before any interview.

"If no counsel was present at the time the alleged statement(s) was made by the defendant, the government must prove to your satisfaction beyond a reasonable doubt that the defendant intelligently and understandingly waived the right to have counsel present at the interview.

"In addition to making the foregoing findings, before you take into consideration the alleged statement(s) and evidence you must also find that the statement(s) was voluntary in accordance with the other instructions given to you, recalling that any statement(s) made outside of the Court should be considered with caution and weighed with great care."

4. "The Court instructs you that it has found that the statement made by the defendant at the time of his arrest was voluntary, and based upon that Court's finding, the Government witnesses were permitted to testify as to certain statements which the defendant was alleged to have made at or following the time of his arrest.

"However, it is for the jury to determine the credibility and weight to be given such statement with respect to defendant's innocence or guilt."

5. "In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances."

* At the hearing on the motion to suppress the attendant testified as follows:
    Q: What did you tell him [police officer]?
    A: I said that I saw three Negroes approaching a yellow Chevrolet.

The Government has cited no statute or municipal ordinance which makes mere public display of a rifle a criminal offense. It is apparently for this reason that the majority relies on circumstances known to the police which were extrinsic to the informant's communication, particularly the occurrence of a high school "race riot" near in time and place to the arrest of Adams.

One of the circumstances noted by the majority is that Adams and his companions were travelling in a moving vehicle. This, we are told, has been held by the United States Supreme Court in Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), to authorize a vehicle stop by police. I cannot agree. The essence of *Carroll* and its progeny is summed up in the *Chambers* opinion as follows:

> In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution. As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search. *Carroll, supra,* holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible. 399 U.S. at 51, 90 S.Ct. at 1981.

*Carroll* did not hold that the capacity of a vehicle to move or the fact that it was so doing provided probable cause to search; those factors, instead, were viewed as exigent circumstances justifying a warrantless search where police officers independently possessed probable cause to search. The potential of a vehicle for movement excuses the failure obtain a warrant, but it cannot validate the stop and search if probable cause therefor is lacking.

The majority next points to "the suspicious behavior of the two passengers [in] staring at the patrolling police officer and then lowering themselves in their seats as though to conceal something." The latter activity, however, occurred after the officer had turned on his light and siren. The fruits of a search by police do not provide original justification for the search; only those facts known to the officers beforehand may be taken into account in assessing probable cause. By the same token, facts which come to the attention of an officer while engaged in stopping a vehicle cannot justify his original decision to stop. They may justify his search of the vehicle and the arrest of its occupants—as, for example, where a stopping officer observes contraband being thrown from the windows of a car—but his decision to stop must be grounded in an independent and prior justification.

This leaves the suspicious circumstance of "staring at the patrolling officer." This followed and was in response to the execution of a U-turn by the police car which eventually made the stop. Staring back at a police car in that circumstance cannot, I think, be taken as more than the natural reaction of any person. This is hardly "unusual behavior" of the sort which justified a stop and frisk in United States v. Lindsey, 451 F.2d 701 (3d Cir. 1971), where the

Q: Okay. That is what you told the police officers.
A: Yes.
Q: And you said you thought you saw one carrying a rifle?
A: Right; what appeared to be a rifle.

Q: Appeared to be a rifle. Okay. And that is all you told the police?
A: Well, I gave him the location when he asked for it.

defendant, attempting to board a plane, identified himself by three different names, displayed "indicia of extreme anxiety," and appeared to be carrying two large objects in his coat pocket. Ballou v. Massachusetts, 403 F.2d 982 (1st Cir. 1968), also cited by the majority, is not apposite in this context; probable cause to stop in that case was not founded on observation of the eventual defendant by the police who stopped him.

I come, finally, to the "race riot" justification for the instant stop. That is the crux of this case. What evidence of a race riot was adduced at the motion to suppress? Dean, the gas station attendant, testified:

Q: Could you tell us, sir, if you saw or noticed anything unusual that day?

A: Yes. Other than the riot that was happening at Washington High School at this time, . . . .

The only other pertinent statement was by Officer Radecki, the policeman who stopped Adams. He mentioned that there was a "disturbance with the students" at nearby Washington High School. In sum, the record establishes a "disturbance" or "riot" void of racial overtones. Only at the trial was the racial character of the riot hinted at.

This reference to a disturbance, standing alone, has no probative bearing on the issue of probable cause to stop. Other questions necessarily arise. Did his knowledge of the disturbance give Officer Radecki good reason to believe that armed men in the vicinity were proceeding or might proceed to the high school to violently intercede in the turmoil? The record is silent on the magnitude or character of the disturbance. More important, did the officer, if he had a reasonable fear of armed intervention, connect Adams and his companions with that fear? Radecki never testified to that effect, and the record would contradict him if he had. It appears that Adams was proceeding *away* from the high school at the time Radecki first

observed the car, and that Adams was at all pertinent times *further* from the high school than he was when first observed by the informant. Finally, was the combination of Radecki's fear with the admonition of the police bulletin the reason for his stop of Adams, or was Radecki relying solely on the bulletin? The only testimony by the officer on the point was:

Q: Wouldn't you say there was a lot of confusion out there that day when —not when you first stopped them, but when you saw the guns in the car?

A: You might say there was a little confusion. I didn't see where anybody was confused. The confusion was out at the school.

Q: You had no knowledge that these people were involved with anything out at the high school, did you?

A: No; just the call came out over the air.

Q: The call didn't say anything about these guys being out of the Washington High School, did it?

A: No, it did not.

Given nothing else, the ambiguity of this testimony must be resolved in favor of Adams.

The majority, I believe, proceeds on the mistaken assumption that the defendant bore the burden of proof on the riot issue at the suppression hearing. At a hearing on a motion to suppress, the defendant-movant bears the burden of coming forward with evidence that his search was not pursuant to warrant or that a warrant issued against him or his property was constitutionally defective. Once he has shown a warrantless search, the Government must shoulder the burden of proving the legality of that search. Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951); McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948); United States v. Gamble, 473 F.2d 1274 (7th Cir., 1973);

Wrightson v. United States, 95 U.S. App.D.C. 390, 222 F.2d 556 (1956); 8A Moore's Federal Practice ¶ 41.08[4] (1972). Why this is so was made evident as far back as *McDonald*:

> Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant *without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.* 335 U.S. at 456, 69 S.Ct. at 193. (Emphasis added.)

Since the Government failed to demonstrate any legal justification to stop the automobile driven by Adams, the subsequent search of the vehicle was unlawful.

In my judgment, the trial judge erred in denying Adams' motion to suppress. I would therefore reverse his conviction.