UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael NOTI, Defendant-Appellant.

No. 83–5064.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 9, 1984.

Decided April 17, 1984.

Daniel J. Gonzalez, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Norman D. James, Heaney, James & Hearn, Los Angeles, Cal., for defendant-appellant.

Before CHOY, NELSON and CANBY, Circuit Judges.

NELSON, Circuit Judge:

Michael Noti appeals from convictions for conspiracy to import, possess, and distribute cocaine, and substantive counts of importation and possession with intent to distribute cocaine. Noti argues that the district court: 1) improperly excluded evidence relating to the government informant's motive to testify; 2) improperly failed to suppress Noti's post-arrest statements; 3) improperly failed to dismiss the indictment due to abuse of grand jury proceedings; and 4) improperly denied Noti's motion to sever his trial from that of codefendant Charles Edwards. We reverse and remand for a new trial.

## FACTS AND PROCEDURAL BACKGROUND

James Higgins and Ben Martin were pilots employed by Pioneer Aviation, a company owned by Howard Pearl and housed at the Van Nuys Airport in Los Angeles. In March 1982 Martin asked Higgins to help locate an airplane to be used by Pioneer clients to scout for movie locations in Central and South America. Higgins was told that the plane would be piloted by Martin and co-piloted by Michael Noti, Pioneer's chief flight instructor. Suspicious of Martin's intentions, Higgins contacted the Los Angeles Police Department (LAPD), which instructed him to cooperate with Martin and report developments. Higgins provided the bulk of the testimony against Noti.

In April 1982 Pearl asked Higgins to replace Martin as pilot of the mission. Pearl later admitted to Higgins that the true purpose of the trip was not as originally represented, but rather to deliver money from South America to a location off the coast of Mexico. Pearl assured Higgins that no violation of United States law would occur. After consulting with the LAPD, Higgins agreed to join the venture for the $5000–$6000 Pearl offered.

Higgins participated in a series of summer planning sessions with Noti, Martin, and Pearl. He also met Richard Ongania and Calum Innes at that time. As part of its preparations, the group selected a private plane and specially equipped it with extra fuel tanks to increase its flying range.

On July 24, 1982, Higgins and Noti set off for Acapulco. At this point, the object of the trip was clear: to smuggle cocaine by concealing it under the floorboards of the plane. Ongania was waiting in Acapulco to join them for the trip south to Peru, where Innes was preparing for the cocaine's delivery. After various delays, the group headed for Lima, Peru with a stopover in Ecuador.

Higgins, Noti, and Ongania intended to fly from Peru to Chile to establish a cover for their South American voyage. They inadvertently flew over a restricted area of Peru, however, and were escorted by the authorities back to Lima. From Lima, they attempted to fly to Paramunga, Peru, the appointed delivery site, but apparent military maneuvers on the ground forced them to continue on to Ecuador. Later discovering that the maneuvers were unrelated to their plans, the group returned to Lima. Higgins, Noti, and Ongania then flew to

Paramunga, where the plane was loaded with cocaine, and continued on to Ecuador and Panama. They left Ongania in Acapulco because he was known to U.S. Customs in San Diego. Higgins and Noti cleared Customs on September 4, 1982, and flew to Van Nuys Airport, where Ongania was waiting for delivery of the cocaine.

Higgins initially received $4000 for his efforts. Noti told Higgins that he had received cocaine rather than cash for his participation and that he was distributing this cocaine. These "distributions" were corroborated by an LAPD trash can search revealing words such as "COCAINE BUSINESS", "8 oz.," "acct," and "cash" on order forms in Noti's handwriting.

In November 1982, Higgins introduced Michael Moren, an undercover Drug Enforcement Administration (DEA) pilot to Pearl as a "drug hauler." Pearl told Moren that he needed financial backing for a repeat performance of the previous South American voyage. Later, however, when it became clear that Noti would not pilot the plane for less than $50,000, Pearl asked Moren to fly with Higgins. As consideration, Moren would get both cocaine and assistance in distributing it.

On November 27, 1982, Moren, Higgins, and DEA Special Agent Janet Moulster flew to Acapulco, picked up Ongania, and continued on to Panama and Peru. This trip substantially mirrored the first. In Peru, Moren met Innes, who described a duffel bag containing $100,000 as "Chuck Edwards' dirty laundry." Moren subsequently met Charles Edwards, who greeted Ongania with obvious recognition. Moren was introduced to Edwards as "Michael Smith," an undercover name, "not Michael Noti." Ongania mentioned that Edwards could easily conceal money below his generous stomach, and that he had in fact done so for the "last trip."

On December 12, the group returned with the cocaine to the United States. The next day, Noti's residence was searched pursuant to a search warrant and 30 grams of cocaine were discovered. After his arrest, Noti admitted to the detective that the cocaine was his; that he knew Howard Pearl but "no longer worked for him;" that he had made one trip to South America for Pearl's organization; and that he had planned to make a second trip but, fearful that the trip would be less successful than the first, asked Pearl for an outrageous sum of money. Noti also recognized the names Ongania and Innes.

On December 22, a six-count indictment was filed charging Pearl, Innes, Ongania, Noti, Martin, and Edwards with conspiracy to import and distribute cocaine in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 963, and, except for Edwards, with substantive counts of importation and possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846. Innes was, and remains, a fugitive. Ongania is in Peruvian custody. Subsequent to arraignment, Pearl pleaded guilty, and Martin was dismissed from the indictment. Only Noti and Edwards proceeded to trial, at which each was convicted. This timely appeal followed.

DISCUSSION

A. *Exclusion of motive evidence was not reversible error.*

■ James Higgins, the government's key witness, testified on cross-examination that his motive for informing against the defendants was his personal opposition to the use of drugs. He denied ever using or selling cocaine. Noti then attempted to introduce extrinsic evidence that Higgins was in fact a user and supplier of cocaine. The district court deemed the evidence inadmissible on the ground that Noti was seeking to attack Higgins' credibility through evidence of specific instances of misconduct. Noti argues that the evidence was offered not to impeach the witness, but rather to shed light on Higgins' actual motive to inform. The district court's ruling is reviewed for an abuse of discretion. *United States v. Cutler,* 676 F.2d 1245, 1248 (9th Cir.1982).

■ Evidence of a witness' past misconduct, other than conviction of a crime, is inadmissible for the purpose of attacking

the witness' credibility. Fed.R.Evid. 404(a) & 608(b). Evidence that happens to include prior misconduct may be admissible, however, when it is offered to show the witness' possible bias or self-interest in testifying. *Burr v. Sullivan,* 618 F.2d 583, 586–87 (9th Cir.1980). In such a case, the adverse party does not have to accept the witness' testimony, but may offer extrinsic evidence to rebut it. *United States v. James,* 609 F.2d 36, 46 (2d Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

■ The exclusion of extrinsic evidence here did not constitute reversible error for two reasons. First, Noti has not demonstrated on appeal that he could have proved any more than Higgins' use and distribution of drugs. There was no offer of proof that Higgins cooperated in the investigation to gain lenient treatment in the future regarding his own drug violations, or that investigation of Higgins was deferred to induce his cooperation. The fact that Higgins used drugs, without more, is not sufficiently probative of motive to mandate reversal. The district court was therefore correct in concluding that the evidence went only to Higgins' credibility.

Second, Noti argued below that he sought to introduce the evidence to negate the suggestion that Higgins' motive was honorable, so that the jury would focus on whether Higgins' financial interest in the case tainted his testimony. Higgins' financial rewards, however, were thoroughly explored at trial. Pearl and U.S. Customs each gave Higgins $10,000, and he had reason to expect more from the LAPD and the DEA. Noti's counsel was free to raise the obvious inferences flowing from these facts in his closing argument. In addition, there was testimony as to Higgins' reputation for untruthfulness, a blatant contradiction between Higgins' and Agent Moren's testimony, and the judge's instruction that the jury should weigh an informant's testimony with greater than ordinary care. In light of this, we conclude that the exclusion of this extrinsic evidence was not error.

**B. *There was no misconduct in the grand jury process requiring dismissal of the indictment.***

Shortly before trial, the prosecution advised Noti that informant Higgins may have falsely informed the LAPD that he had accompanied Noti and Ongania to the Paramunga airfield where he observed Noti remove the cocaine from a suitcase and secrete it beneath the floorboards of the aircraft. Noti's motion to dismiss the indictment on the ground that false information had been presented to the grand jury was denied. He raises the same argument on appeal.

■ "Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way, as where perjured testimony has knowingly been presented." *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir.1978). The district court's refusal to dismiss is reviewed for abuse of discretion. *United States v. Eden,* 659 F.2d 1376, 1382 (9th Cir.1981).

■ Here Noti has not demonstrated significant deception or overreaching. The prosecutor did not knowingly present perjured testimony. When Agent Moren was in South America with Ongania and Higgins, he inferred from a conversation with Ongania that Higgins may not have actually been at the Paramunga airfield in September when the cocaine was loaded. Ongania told him that Higgins was reluctant to return to Peru after the first attempt to land there was aborted. He therefore remained in Ecuador, while Ongania and Noti went to Peru.

This version of the events was not entirely consistent with what Moren had heard before going undercover. However, because it did corroborate Noti's presence during the Paramunga pick-up, Moren did not mention the discrepancy to the LAPD. When LAPD Detective Conner appeared before the grand jury, therefore, his testimony included Higgins' statements to him about being at Paramunga. It was only a week later that Moren, reviewing the war-

rant that had been used to search Noti's residence, realized that Detective Conner had relied on Higgins' statements in his grand jury testimony. Moren notified Conner, and a meeting was held with the Assistant United States Attorney. Higgins, when questioned about the discrepancy, still maintained that he had been on the plane when it landed at Paramunga.

Contrary to Noti's contention, this case is substantially different from *United States v. Basurto*, 497 F.2d 781 (9th Cir.1974). There, not only was the false testimony material to the grand jury's probable cause finding, but the government informant admitted perjury. Here the prosecutor presented the most reliable evidence it had, and the government informant stuck by his story even after the inconsistency was unearthed. Substantively, Noti's case would not have profited from the introduction of Ongania's statement, as Ongania confirmed Noti's presence at Paramunga. At most, Higgins' credibility may have been weakened. The district court did not find that this possibility warranted dismissing the indictment. Since there was no proof of perjury or bad faith on the prosecutor's part, we uphold the district court's decision on this issue.

### C. *Admission of Noti's post-arrest statements was improper.*

Shortly after being arrested at his home, Noti was given the following warning by Los Angeles Police Detective A. Panzica:

Michael, you have the right to remain silent, the right to the services of an attorney before questioning, if you desire an attorney, and cannot afford one, an attorney will be appointed by the Court with no charge to you. Any statement you do make can and will be used against you in a court of law. Do you understand each of these rights?

■ Noti contends that these *Miranda* warnings were defective because the officer failed to tell him that he had the right to counsel *during* questioning as well as *before* questioning. Therefore, he argues, his motion to suppress post-arrest state-

ments was improperly denied. We review the adequacy of Noti's rights advisement, a question of law, *de novo.*

Initially, we note that *Miranda* itself certainly suggests that the right to counsel *during* questioning is significant, independent of the right to counsel before questioning: "[W]e hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today." *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 1626, 16 L.Ed.2d 694 (1966). Although the Supreme Court does not require that the language of *Miranda* be read verbatim to defendants (as long as the warning is not misleading), *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981) (per curiam), it has repeatedly emphasized the critical importance of the right to know that counsel may be present *during* questioning.

Here, ... nothing in the warnings given respondent suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right "to a lawyer before you are questioned, ... while you are being questioned, and all during the questioning."

*Id.* at 360–61, 101 S.Ct. at 2809–10 (citation omitted) (second ellipsis in original). *See Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). There can be little question, then, that the right to have counsel during questioning is fundamental to the *Miranda* scheme.

■ We are not permitted, however, merely to apply the plain language of *Miranda* to the case before us. Rather, we must examine the *Miranda* warnings from a practical viewpoint. *Camacho v. United States*, 407 F.2d 39, 42 n. 2 (9th Cir.), *cert. denied*, 396 U.S. 944, 90 S.Ct. 380, 24 L.Ed.2d 245 (1969). If a defendant has been told the substance of his constitutional rights, it is not fatal if irrelevant words

or words with no independent substance are omitted. *See California v. Prysock,* 453 U.S. at 359, 101 S.Ct. at 2809. In previous cases, we have stressed the importance of informing defendants that they have the right to the actual *physical presence* of an attorney, *Smith v. Rhay,* 419 F.2d 160, 163 (9th Cir.1969), and the right to have an attorney present *immediately. Id.; see also California v. Prysock,* 453 U.S. at 361, 101 S.Ct. at 2810. Although the warnings given Noti probably did not convey to him the right to the actual physical presence of an attorney, Noti has not raised this issue on appeal. Rather, he argues only that there is substantive importance to being informed of the right to counsel *during* questioning independent of being informed of the right to counsel *before* questioning.

This court has not considered the precise issue whether a defendant is entitled to know that he has the right to the presence of counsel during interrogation. The Second Circuit has deemed the omission of this warning insignificant, holding that *Miranda* is satisfied by the inference that can be drawn from the combination of statements that the individual has the right to remain silent and that he has the right to consult with counsel. *See United States v. Lamia,* 429 F.2d 373, 377 (2d Cir.), *cert. denied,* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970). *Accord, United States v. Adams,* 484 F.2d 357, 361–62 (7th Cir.1973). The Fifth Circuit, however, rejects this approach. It explicitly concludes that "[m]erely telling [a defendant] that he could speak with an attorney ... before he said anything at all is not the same as informing him that he is entitled to the presence of an attorney *during* interrogation and that one will be appointed if he cannot afford one." *Windsor v. United States,* 389 F.2d 530, 533 (5th Cir.1968) (emphasis added). Thus, the Fifth Circuit finds advisement of the right to counsel during questioning to be a vital part of the *Miranda* protections.

▆ Although the question is a close one, we prefer the Fifth Circuit's approach to this issue. There are substantial practical reasons for requiring that defendants be advised of their right to counsel during as well as before questioning. "The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will.... Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process." *Miranda v. Arizona,* 384 U.S. at 369–70, 86 S.Ct. at 1625–26, *citing Escobedo v. Illinois,* 378 U.S. 478, 485 n. 5, 84 S.Ct. 1758, 1762 n. 5, 12 L.Ed.2d 977 (1964). Concerned that a defendant who chooses not to consult with counsel before questioning will be unaware of his right to counsel once questioning begins, the Supreme Court has held that "the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." *Miranda v. Arizona,* 384 U.S. at 469–70, 86 S.Ct. at 1625–26. The right to have counsel present during questioning is meaningful. Advisement of this right is not left to the option of the police; it is mandated by the Constitution.

Finally, we note how simple it is for the police to avoid allegations of error in the *Miranda* warnings. Although the Supreme Court does not require a verbatim reading of the *Miranda* rights to defendants, *see California v. Prysock,* 453 U.S. at 359, 101 S.Ct. at 2809, it certainly does not prohibit it. The police can always be certain that *Miranda* has been satisfied if they simply read the defendant his rights from a prepared card. Although we do not require such a reading, we encourage it. A verbatim reading would, in all instances, preclude claims such as Noti's.

▆ Having determined that Noti's constitutional rights were violated, we must consider whether the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Admission of the post-arrest statements will be considered harmless only if substantial,

independent, and credible evidence of Noti's guilt was presented at trial. *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir.1978). Here, that evidence was lacking. The bulk of the testimony against Noti was provided by government informant James Higgins. Higgins' credibility was a point of contention at trial, and it is likely that his testimony was credited in part because it was corroborated by Noti's statements. We cannot conclude that admission of Noti's statements at trial was harmless beyond a reasonable doubt. *Id.* Thus, we reverse and remand for a new trial.

Because a new trial is required, we do not address the issue whether the district court improperly denied Noti's motion to sever. The new trial, on remand, will necessarily be severed from any earlier proceedings in which Noti's codefendant was involved.

CONCLUSION

The warnings given to Noti were defective under *Miranda.* Because the admission of Noti's post-arrest statements was not harmless beyond a. reasonable doubt, we reverse and remand for a new trial.

REVERSED and REMANDED.

CHOY, Circuit Judge, dissenting in part:

A *Miranda* warning is judged from a practical viewpoint, *Camacho v. United States*, 407 F.2d 39, 42 n. 2 (9th Cir.), *cert. denied*, 396 U.S. 944, 90 S.Ct. 380, 24 L.Ed.2d 245 (1969), and is considered adequate if it conveys the substance of the defendant's constitutional rights, *see California v. Prysock*, 453 U.S. 355, 359–60, 101 S.Ct. 2806, 2809–10, 69 L.Ed.2d 696 (1981). I believe that the warning given adequately informed Noti, in a practical common-sense way, that he had an unqualified right to have an attorney present in general, and that he was entitled to have the attorney there before any questioning began.

Noti was not "specifically told that he had the right to have an attorney present during actual questioning, yet such an inference can readily be drawn from the circumstances of the warning." *United States v. Cusumano*, 429 F.2d 378, 380 (2d Cir.), *cert. denied*, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970); *accord Sweeney v. United States*, 408 F.2d 121, 124 (9th Cir. 1969) (dictum). Other circuits have held that a specific reference in the *Miranda* warning to a right to have an attorney present during the questioning is unnecessary. *United States v. Adams*, 484 F.2d 357, 361–62 (7th Cir.1973); *Tasby v. United States*, 451 F.2d 394, 398–99 (8th Cir.1971), *cert. denied*, 405 U.S. 992, 92 S.Ct. 1262, 31 L.Ed.2d 459, 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972). I would hold that Noti's *Miranda* rights were not violated.